UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

   Plaintiff,

v.               Case No. 17-CR-96-pp

MYCHAL SYKES,

   Defendant.

**ORDER ADOPTING RECOMMENDATION (DKT. NO. 156) AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 137)**

On December 12, 2017, the defendant filed a motion to suppress all evidence and derivative evidence obtained from intercepted conversations, arguing that the wiretap applications did not meet the necessity requirement of 18 U.S.C. §2518(1)(c). Dkt. No. 137. The defendant simultaneously filed a motion for bill of particulars. Dkt. No. 138. Magistrate Judge William E. Duffin issued a recommendation and order on February 2, 2018, recommending that this court deny the motion to suppress because the government had met its burden by establishing necessity for the wiretap. Dkt. No. 156. In the same order, Judge Duffin granted the motion for a bill of particulars. Id. The defendant timely objected to the recommendation, asserting that Judge Duffin failed to address the specific shortcomings in the application that the defendant had raised in his earlier pleadings. Dkt. No. 159. The court will

overrule the objection, adopt Judge Duffin's recommendation and deny the motion to suppress.

I. **Standard of Review for Recommendation**

Rule 59(b) governs dispositive motion practice initiated before magistrate judges. Fed. R. Crim. P. 59(b). Parties have fourteen days to file "specific written objections" to a magistrate judge's report and recommendation on a dispositive motion. Fed. R. Crim. P. 59(b)(2). When reviewing a magistrate's recommendation, the district judge reviews *de novo* the recommendations of the magistrate judge to which a party timely objects. 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(B)(2), (3). The court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." Id.

II. **Government's Burden to Demonstrate Necessity**

When applying for a wiretap, the government must make "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c); United States v. Long, 639 F.3d 293, 301 (7th Cir. 2011). Courts refer to this as the necessity requirement. United States v. Campos, 541 F.3d 735, 746 (7th Cir. 2008). The government's burden to prove necessity "is not great," and the court evaluates compliance with this requirement in a "practical and common-sense fashion." Campos, 541 F.3d at 746. Nothing requires a showing of "absolute" necessity, or a showing that seeking the wiretaps was a last resort. Long, 639 F.3d at 301 (7th Cir. 2011). The necessity provision requires only that the wiretap applicant

2

show that the success of other methods of investigation appears unlikely or too dangerous. Campos, 541 F.3d at 746. The requirement exists to ensure that the government does not use the wiretaps as a first step in an investigation. United States v. Durham, 2014 WL 4362838, *5 (7th Cir. 2014).

### III. Defendant's Objections

In his objection to Judge Duffin's recommendation, the defendant notes that Judge Duffin relied on the fact that the government does not shoulder a heavy burden. Dkt. No. 159 at 1. He points to the fact that Judge Duffin felt that the government had shown necessity because it showed the need to unearth additional co-conspirators. Id. He referenced Judge Duffin's observation that the government had indicated in the applications that the drug conspiracy it was investigating was of unknown scope. Id. The defendant characterizes these as "broad principles," and concedes that they are a correct statement of the law. Id. at 2. He argues that the principles are so broad, however, that under them, "a wiretap would always be deemed necessary if the government hasn't learned every detail about a suspect or an organization that might exist." Id. He also asserts that the principles assume that the reason law enforcement's other efforts did not uncover further information could be because there isn't any information to uncover, and not because the other means of investigation weren't sufficient. Id. For these reasons, the defendant argues that the fact that the scope of the conspiracy was not known is not sufficient to show the "necessity" of a wiretap. Id.

The defendant next argues that the government's assertion that a wiretap was needed to identify the conspiracy's supplier was not sufficient. Id. at 3. The defendant asserts that the government didn't follow up on other investigative methods that would have identified the source. He disputes Judge Duffin's observation that doing things like surveilling one of the co-conspirators might have risked the investigation, arguing (without citing legal authority) that "the mere fact that an investigation [presumably, other methods of investigation than a wiretap] might carry some risk isn't enough." Id. And he asserts that "neither the government nor the magistrate judge explain how [the co-conspirator] possibly realizing he was under surveillance would have scuttled the investigation." Id.

Next, the defendant asserts that Special Agent Richard Bilson's affidavits were not sufficient to demonstrate necessity. Id. He argues that the affidavits took a "divide-and-conquer" approach to necessity, by asserting that each individual technique (such as surveillance, or a garbage search, or a trap-and-trace) alone might not establish probable cause, without addressing whether all of the techniques cumulatively might have done so. Id. He takes issue with Judge Duffin's response that a reviewing judge could have conducted that calculation, arguing that Judge Duffin failed to do so. Id.

The defendant concludes by stating that it "should not be enough" for the government to state that it doesn't know the scope of the conspiracy, can't identify the suppliers, or that that a single investigative technique would not

4

work. Id. He asks the court to reject Judge Duffin's recommendation, and to suppress the fruits of the wiretaps.

**IV.    The Court's Analysis**

On June 6, 2017, the government charged the defendant and nine others with various drug and firearm offenses. Dkt. No. 1. During the government's investigation, this court entered two orders under 18 U.S.C. §2518, authorizing the interception of wire communications to and from two cellular telephones used by Kavanaugh Coleman, who the government believed to be the leader of the drug trafficking organization. Dkt. No. 137-1 at 95, 196. The government voluntarily terminated the interception of phone number 414-487-7407 under the first order (authorized on March 17, 2017), because Coleman no longer used that number. The second order, dated May 5, 2017, authorized the interception of wire communications to and from the second phone number, 414-745-2347, for a period of thirty days. Dkt. No. 137-1 at 196.

The government supported its applications with affidavits prepared by Bilson, who has worked for the Federal Bureau of Investigation since 2010. Dkt. No. 137-1 at 1-70, 96-170. In his March 17, 2017 affidavit, Bilson explained that the government had probable cause to believe that Coleman acted as the leader of the Coleman drug trafficking organization, which distributed multi-ounce to kilogram quantities of heroin and cocaine in the Milwaukee area. Dkt. No. 137-1 at 12. Multiple confidential sources provided historical information, recorded phone calls and bought distribution quantities of heroin from Coleman and other members of the organization. Id. at 12-13. At

5

the time of the application, the investigation had used traditional law enforcement methods such as confidential sources, gathering and analysis of information from other agencies, documentary evidence, analysis of pen register data and telephone data, physical surveillance, garbage searches and controlled purchases of narcotics from Coleman and other members of the organization. Id. at 13.

Beginning at paragraph sixty of the March 17, 2017 affidavit, and at paragraph seven-seven of the May 5, 2017 affidavit, Bilson explained the necessity for interception of the wire communications. Id. at 46, 146. Although the defendant argued that Bilson's affidavits "are replete with general assertions that would be true in most narcotic investigations," dkt. no. 137 at 8, Bilson addressed the eleven investigative devices that had been tried (with the exception of the grand jury subpoena), why they had limited or no success, and why their continued use was either unlikely to produce the necessary information or too risky. Dkt. No. 137-1 at 46-67, 146-167. Up to that point, despite using those techniques, the investigation been unable to identity all of the co-conspirators, the sources of heroin and cocaine, or the roles and extent of involvement of the individuals in the criminal organization. Id. at 46-47, 146-47. Bilson requested authorization for the wiretaps in part because the investigation had failed to determine "when, how, or where this organization obtains it controlled substances and where the proceeds of the drug trafficking are stored or expended." Id. at 46, 147.

The defendant argues that a wiretap is not necessary where these techniques had provided "an abundance of information to arrest Coleman and others for serious drug offenses and to obtain search warrants for his residence and stash houses." Dkt. No. 137 at 2. First, this argument ignores one reality: as soon as agents arrested Coleman and others—indeed, as soon as Coleman or his associates became aware they were under investigation—the other conspirators and the suppliers would be aware of the investigation, too. Once the government arrested these individuals, it is highly unlikely that co-conspirators and suppliers would continue business as usual, or stick around to see what happened next.

Further, this argument ignores Seventh Circuit precedent holding that even when normal investigative techniques had been successful to some extent, a wiretap was necessary where the normal techniques were unlikely to identify all co-conspirators at all levels of the drug conspiracy. See Campos, 541 F.3d at 748 (citing United States v. Zambrana, 841 F.2d 1320, 1331-1332 (7th Cir. 1988)). The Seventh Circuit also has explained that "using a wiretap to obtain additional incriminating evidence against a defendant is not problematic," and that it does not preclude a finding of necessity even where the government had enough to indict the defendant and others prior to the wiretap. Id.

The defendant correctly points out that the government had as many as five confidential informants and one undercover agent providing information about Coleman. Bilson explained, however, how the confidential informants's limited access and knowledge was consistent with Bilson's own knowledge and

7

experience about how the substance distributors operate—precluding access to other aspects of the organization. Dkt. No. 137-1 at 48, 148-49. Bilson also cited safety concerns because the Coleman organization (known as the "Flash Gang") had ties to the Vice Lord and Gangster Disciple Street gangs, who are known for witness intimidation. Id. at 50, 151. According to Bilson, attempts to make controlled purchases had been limited to retail/user purchases, and all the cooperators had made the purchases in neutral locations (which did not allow the government to identify the sources of fully identify the stash locations). Id. at 51, 151. The Seventh Circuit has held the government's showing of necessity was sufficient where the affidavit explained that agents had not been successful in gathering sufficient evidence regarding drug storage locations, quantities of drugs or the source of the supply. United States v. Dumes, 313 F.3d 372, 378 (7th Cir. 2002).

Paragraphs sixty-nine through seventy-six of the March 17, 2017, affidavit and paragraphs eighty-six through ninety-three of the May 9, 2017 affidavit discussed the use of physical surveillance and tracking devices. Dkt. No. 137-1 at 51-57, 152-157. Case agents unsuccessfully attempted to follow vehicles, which proceeded at extremely high rates of speed and with erratic driving. Id. Coleman himself had been observed in five different vehicles, including rentals. Id. Based on Bilson's training and experience, he believed that Coleman was "extremely surveillance conscious," and that further efforts would disclose the investigation. The Seventh Circuit has found necessity where surveillance techniques were too dangerous or threatened to reveal the

8

investigation. United States v. Ceballos, 302 F.3d 679, 683-84 (7th Cir. 2002); see also United States v. Adams, 125 F.3d 586, 595-596 (7th Cir. 1997).

Bilson's affidavits outlined the use of undercover agents, who had not been able to infiltrate the network, and search warrants, which he believed would compromise the investigation by alerting the target subjects and allowing them to insulate themselves from detection. See United States v. Gray, 410 F.3d 338, 343 (7th Cir. 2005). Bilson explained that, to the extent that the agents had conducted interviews, the interviews had provided only limited information. Two of the individuals interviewed refused to provide any information or otherwise cooperate. Bilson opined that it would be unwise to use a grand jury subpoena when the target subjects would plead the Fifth Amendment, and opined that granting witnesses immunity would be unwise at that stage of the investigation because it could foreclose prosecution of the most culpable members. Subpoenas also would alert the other members of the organization. The Seventh Circuit has found necessity where the government had alleged that the undercover agents had not been able to infiltrate the organization, the DEA had not been able to identify locations where they could search for the drugs and money, the dealers distributed in an isolated location with countersurveillance equipment and the dealers were likely to invoke their Fifth Amendment rights if subpoenaed. Gray, 410 F.3d at 343.

Finally, Bilson discussed the efforts to use a trash pull, video surveillance, and pen register and trap devices. The trash pull had been unsuccessful because Coleman's residence was gated, Joshua Brown's

9

residence used a common dumpster, and the stash house located at 3050 N. Richards Street in Milwaukee had no trash in the assigned trash cans. Dkt. No. 137-1 at 62, 162. One video surveillance camera had been installed facing the stash house, but was of limited value because the cameras were not mobile and did not use audio. Id. at 64, 163. Pen register and trap-and-trace devices had established links between the targets and potential sources, but could not identify the nature, roles, position or participation of the callers within the conspiracy. Id. at 65-66, 164-65.

As noted above, the government submitted Bilson's affidavits, and the wiretap applications, to this court. This court reviewed all of information in Bilson's affidavits. It was this court that decided, in both instances, that the government had alleged sufficient facts to demonstrate necessity as defined under the case law. The defendant's argument that Judge Duffin did not look at the cumulative investigative techniques to determine whether they obviated the necessity of a wiretap is an odd one, given that *this court* already had done just that.

At the time the government made the applications, this court considered all of Bilson's statements and reviewed the affidavits in a "practical and common sense fashion." See Campos, 541 F.3d at 746. This court found then, and continues to find now, that the government established necessity. The government did not rely solely on boilerplate language; it separately addressed each of the investigative techniques that the agents had used and why they would not work, or would no longer work or were too risky. The government

demonstrated that wiretaps were not the first investigative techniques used, "which is the evil we are trying to avoid". Campos, 541 F.3d at 749 (quoting United States v. Fudge, 325 F.3d 910, 919 (7th Cir. 2003)).

Judge Duffin's finding that the government established necessity follows this court's identical finding; nothing in the defendant's motion or objection changes this court's conclusions. The court will deny the motion to suppress.

## V. Conclusion

The court **ADOPTS** Magistrate Judge Duffin's report and recommendation. Dkt. No. 156. The court **DENIES** the defendant's motion to suppress. Dkt. No. 137.

Dated in Milwaukee, Wisconsin this 11th day of April, 2018.

BY THE COURT:

_____
**HON. PAMELA PEPPER
United States District Judge**